**SAWYER & LABAR LLP**
Adrian Sawyer (Bar # 203712)
sawyer@sawyerlabar.com
1700 Montgomery Street, Suite 108
San Francisco, CA 94111
(415) 262-3820

*Attorneys for Plaintiffs*

*Additional Attorneys Listed on Signature Page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARBOR CAPITAL APPRECIATION FUND and HARBOR CAPITAL APPRECIATION CIT,<br><br>Plaintiffs,<br><br>v.<br><br>DOCUSIGN, INC., DANIEL D. SPRINGER, MICHAEL J. SHERIDAN, CYNTHIA GAYLOR, and LOREN ALHADEFF,<br><br>Defendants. | Case No. |

**COMPLAINT AND JURY DEMAND**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........ 2

JURISDICTION AND VENUE ........ 3

PARTIES ........ 4

I. Plaintiffs ........ 4

II. Defendants ........ 4

FACTUAL ALLEGATIONS ........ 5

I. DocuSign ........ 5

II. DocuSign's Reporting Obligations as a Public Company ........ 5

III. The Global Pandemic Creates Increased Demand for DocuSign ........ 7

IV. Defendants Assure Investors that the Pandemic Growth DocuSign Was Experiencing Was Sustainable Even After the Pandemic Subsided ........ 8

V. Contrary to Defendants' Public Statements, Defendants Knew that the COVID-19-Fueled Demand Was Unsustainable ........ 9

VI. The Truth Gradually Emerges ........ 12

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........ 14

I. Defendants' False and/or Misleading Statements about the Sustainability of DocuSign's COVID-19 Pandemic-Driven Growth ........ 14

II. Defendants' False and Misleading Statements About the Effectiveness of DocuSign's Internal Disclosure Controls and Procedures ........ 19

ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ........ 21

PLAINTIFFS' ACTUAL RELIANCE ........ 23

PRESUMPTION OF RELIANCE ........ 24

LOSS CAUSATION ........ 25

NO SAFE HARBOR ........ 26

FIRST CAUSE OF ACTION ........ 26

SECOND CAUSE OF ACTION ........ 29

THIRD CAUSE OF ACTION ........ 30

PRAYER FOR RELIEF ........ 31

JURY DEMAND ........ 31

Plaintiffs Harbor Capital Appreciation Fund and Harbor Capital Appreciation CIT collectively, "Plaintiffs") are purchasers of the common stock of DocuSign, Inc. ("DocuSign" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, bring this action against Defendant DocuSign and several of its former executive officers: former Chief Executive Officer Daniel D. Springer ("Springer"), former Chief Financial Officer Michael J. Sheridan ("Sheridan"), former Chief Financial Officer Cynthia Gaylor ("Gaylor"), and former Chief Revenue Officer Loren Alhadeff ("Alhadeff" and, together with DocuSign, Springer, Sheridan, and Gaylor, "Defendants"), and allege the following upon personal information as to themselves and their own acts, and upon information and belief as to other matters.

Plaintiffs' information and belief is based on an investigation by their attorneys, which includes, among other things, a review and analysis of: DocuSign's public filings with the United States Securities and Exchange Commission ("SEC"), DocuSign's press releases, statements made by DocuSign's representatives at investor and industry conferences, DocuSign's earnings releases, earnings call transcripts and earnings presentations, postings on DocuSign personnel's social media accounts, media and analyst reports concerning DocuSign, documents publicly filed in *Weston v. DocuSign, Inc.*, No. 22-cv-00824-VC (N.D. Cal.) (the "Class Action"), and other publicly available documents concerning DocuSign.

Plaintiffs' information and belief is also based on its attorneys' investigation of the confidential witnesses referenced in the Class Action complaint. Specifically, Plaintiffs' attorneys reviewed documents publicly filed in the Class Action, including the redacted deposition transcripts of the confidential witnesses identified in the Amended Consolidated Class Action Complaint (the "Class Complaint") as "CW1," "CW3," and "CW4"; the parties' Updated Joint Case Management Statement dated January 10, 2025; the parties' Joint Discovery Dispute Letter, dated February 28, 2025; and other filings relating to or discussing the confidential witnesses and the statements attributed to them in the Class Complaint.

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for

discovery.

## NATURE OF THE ACTION

1. This is an action to recover significant investment losses suffered as a result of numerous false and misleading statements and omissions made by Defendants about the sustainability of DocuSign's COVID-19 pandemic-driven growth.

2. DocuSign's primary product is "eSignature," which allows users to sign and send documents digitally, without needing paper copies or wet signatures.

3. The onset of the COVID-19 pandemic in March 2020 created skyrocketing demand for eSignature because of lockdown orders requiring people to stay in their homes and businesses to close, which made physical signing of documents very difficult.

4. A prominent question that investors and analysts had as the pandemic waned and vaccines were being developed was whether DocuSign could sustain this growth in a post-pandemic era.

5. Throughout 2020 and 2021, DocuSign's leaders repeatedly assured investors that – based on its internal data and customer feedback – the Company would continue on the same growth trajectory even after the pandemic ended. Among other things, Defendants assured investors that based on their tracking of the data and inside knowledge of the business, that customers "do not go back" once they start using DocuSign.

6. However, these statements were materially false and/or misleading and omitted to state material facts.

7. DocuSign knew and concealed from investors numerous adverse material facts indicating that the COVID-19-fueled demand it was experiencing was unsustainable.

8. DocuSign knew that much of the new business influx at the beginning of the pandemic was for one-time COVID-related uses and that customers had told the Company that they would stop using its eSignature product once they returned to their offices.

9. Moreover, DocuSign's internal metrics and data undermined the sustainability of DocuSign's COVID-19 pandemic-driven growth.

10. Starting at the end of 2021, statements made in DocuSign's quarterly earnings

releases and on the accompanying earnings calls revealed that the Company was experiencing dramatically slowed billings growth as a result of waning demand for its products as customers began returning to their offices and resumed in-person signature processes. As a result, the price of DocuSign's stock tumbled.

11. The effect of Defendants' material misrepresentations and omissions was to artificially inflate the price of DocuSign's common stock.

12. Plaintiffs purchased DocuSign common stock at a time when Defendants – unbeknownst to Plaintiffs – were misrepresenting the sustainability of DocuSign's COVID-19 pandemic-driven growth and the effectiveness of the Company's disclosure controls.

13. As the truth was slowly revealed to the market and the previously concealed risks materialized, the price of DocuSign common stock plummeted, and Plaintiffs suffered significant losses.

14. Plaintiffs therefore bring this action under the federal securities laws and the common law to recover the investment losses they suffered as a result of Defendants' materially false and misleading statements and omissions of material fact.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

16. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District. DocuSign has its principal place of business in this District and Defendants committed tortious acts and transacted business in this District.

18. In connection with the acts, transactions and conduct alleged herein, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## PARTIES

### I. Plaintiffs

19. Plaintiff Harbor Capital Appreciation Fund is a series of the Harbor Funds. The dates on which Plaintiff Harbor Capital Appreciation Fund purchased DocuSign common stock during the relevant period are set forth in Exhibit A.

20. Plaintiff Harbor Capital Appreciation CIT is a collective investment fund of the Harbor Collective Investment Trust. The dates on which Plaintiff Harbor Capital Appreciation CIT purchased DocuSign common stock during the relevant period are set forth in Exhibit B.

21. At all relevant times, Jennison Associates LLC ("Jennison") acted as investment subadviser to Plaintiffs in connection with their purchases of DocuSign common stock.

### II. Defendants

22. Defendant DocuSign is a Delaware corporation with its principal place of business in San Francisco, California. DocuSign's common stock is publicly traded in the United States on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "DOCU."

23. Defendant Daniel Singer served as DocuSign's President and Chief Executive Officer ("CEO") from January 2017 to June 2022. He also was a member of DocuSign's Board of Directors ("Board") from 2017 to 2025.

24. Defendant Michael Sheridan was DocuSign's Chief Financial Officer ("CFO") for more than five years until September 2020, when he became DocuSign's President of International. He left DocuSign in November 2021.

25. Defendant Cynthia Gaylor replaced Sheridan as DocuSign's CFO, which job she held until June 2023. Prior to being CFO, Gaylor was a member of DocuSign's Board and was Chair of the Board's Audit Committee for almost two years.

26. Defendant Loren Alhadeff served as DocuSign's Chief Revenue Officer from 2019 to 2022.

## FACTUAL ALLEGATIONS

### I. DocuSign

27. DocuSign is a software company based in San Francisco.

28. DocuSign's flagship product is "eSignature," which, according to the Company, "allows an agreement to be signed electronically on a wide variety of devices, from virtually anywhere in the world, securely." In other words, DocuSign's eSignature allows users to sign and send documents digitally, without needing paper copies or wet signatures.

29. In order for a customer to obtain access to DocuSign's eSignature product, the customer has to purchase a subscription from DocuSign. The subscriptions generally range from one to three years in duration.

30. At all relevant times, DocuSign's eSignature subscriptions were the largest single contributor to DocuSign's revenues, accounting for around 95% of the Company's annual revenues.

31. DocuSign groups its customers into three categories: enterprise businesses, commercial businesses, and very small businesses ("VSBs," which DocuSign defines as companies with fewer than 10 employees, including sole proprietorships and individuals).

32. According to DocuSign's filings with the SEC, "VSBs tend to become customers quickly with very little to no direct sales or customer support interaction and generate smaller average contract values." Enterprise business customers and commercial business customers, on the other hand, "typically involve longer sales cycles, larger contract values and greater expansion opportunities."

33. A "key performance metric" for DocuSign is "billings." DocuSign defines "billings" as total revenues (i.e., the money the Company actually receives from customers) plus the change in contract liabilities and refund liability less contract assets and unbilled accounts receivable in a given period. DocuSign uses billings to measure and monitor its ability to provide its business with the working capital generated by upfront payments from its customers.

34. Billings is the primary metric that DocuSign uses to track performance and growth.

### II. DocuSign's Reporting Obligations as a Public Company

35. Under the regulations and guidance promulgated by the SEC, companies whose

stock is publicly traded in the United States – such as DocuSign – have important public reporting and disclosure obligations.

36. Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and financial condition. Investors generally rely on the accuracy and transparency of these disclosures – as well as other public statements made by the company – when determining whether to invest.

37. In conjunction with their quarterly filings with the SEC, most public companies (including DocuSign) publish "earnings releases" (written press releases summarizing their quarterly results and performance) and hold public "earnings calls," which are accessible to all members of the public, to discuss the quarterly results and the company's performance with analysts and investors.

38. As part of their regulatory obligations, public companies like DocuSign are required to maintain effective disclosure controls and procedures to ensure that material information is accurately reported to investors. Members of the company's executive team must be involved in creating and designing these controls, and must personally guarantee their effectiveness in SEC filings.

39. The Committee of Sponsoring Organizations of the Treadway Commission's Internal Control – Integrated Framework defines an internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance." With respect to the reporting and compliance aspects of this definition, the Integrated Framework specifically states that "[w]hen internal control is determined to be effective, senior management and the board of directors have reasonable assurance [that] . . . the organization prepares reports in conformity with applicable laws, rules and regulations, and standards established by legislators, regulators, and standard setters, . . . [and that] the organization complies with applicable laws, rules and regulations." *See* The Committee of Sponsoring Organizations of the Treadway Commission's Internal Control – Integrated Framework § 3 ("Requirements for Effective Internal Control").

40. Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires public companies to publish information in their annual and quarterly reports concerning the scope and adequacy of their internal control structure and assessing the effectiveness of such internal disclosure controls and procedures.

41. Section 302 of SOX requires a public company's CEO and CFO to provide certifications concerning their review of, and disclosure of information about, the company's internal controls.

42. In addition to complying with SOX, public companies are required to follow the standards developed by the SEC governing what information must be disclosed to investors. Material information provided to investors must be true and accurate. SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) prohibits a company from making materially false or misleading statements in connection with the purchase and sale of its securities.

43. Throughout the relevant period Defendants represented to investors that DocuSign was complying with these important public reporting obligations by timely disclosing truthful material facts about its business and maintaining effective disclosure controls. However, as explained in greater deal below, and unbeknownst to the market, Defendants made material misrepresentations that artificially inflated the price of DocuSign's common stock.

## III. <u>The Global Pandemic Creates Increased Demand for DocuSign</u>

44. The onset of the COVID-19 pandemic in March 2020 created a dramatic growth opportunity for DocuSign.

45. Because of lockdown orders requiring people to stay in their homes and businesses to close to mitigate the spread of COVID-19, physical signing of documents became more challenging.

46. With the onset of remote work, virtual meetings, and travel restrictions, many businesses turned to DocuSign's eSignature product to accomplish tasks previously done in-person.

47. As a result, the demand for DocuSign's eSignature product skyrocketed to unprecedented levels.

48. On June 4, 2020, DocuSign reported that, as of April 30, 2020, subscription revenue was up 39% and billings were up 59% year-over-year.

49. On September 30, 2020, DocuSign reported that, as of July 31, 2020, subscription revenue was up 45% and billings were up 61% year-over-year.

## IV. Defendants Assure Investors that the Pandemic Growth DocuSign Was Experiencing Was Sustainable Even After the Pandemic Subsided

50. The pandemic-driven growth led investors and potential investors in DocuSign a fundamental question: once the pandemic subsided, was the growth experienced by DocuSign sustainable? That is, would customers driven to DocuSign by necessity due to the pandemic continue to use DocuSign when the pandemic ended, or would they return to the status quo of signing documents in-person?

51. DocuSign repeatedly assured investors that – based on its internal data and customer feedback – the Company would continue on the same growth trajectory even after the pandemic subsided.

52. For example, on June 4, 2020, during DocuSign's earnings call, CEO Springer told investors "even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes. Once they take their first digital transformation steps with us and they realize the time, cost, and customer experience benefits, they rarely go back."

53. During that same call, CFO Sheridan made a similar representation to investors: "[T]hese customers will remain with us" because "the value propositions . . . we're delivering are sustainable, whether it's a work-from-home environment or not."

54. Defendants repeated these statements over-and-over again during the relevant period. On December 3, 2020, for example, CEO Springer stated on an earnings call that customers "do not go back" and that "[w]e believe that trend"—the move by customers from paper to digital processes—"will hold when the pandemic subsides."

55. Over the next year, Defendants kept providing these assurances to investors.

**V. Contrary to Defendants' Public Statements, Defendants Knew that the COVID-19-Fueled Demand Was Unsustainable**

56. Although Defendants gave assurances about sustainable customer demand to investors, in reality, that contradicted the internal data and customer feedback that DocuSign was compiling.

57. Rather than creating permanent converts, the Company was seeing warning signs that the pandemic-related boom would not last.

58. Defendants knew that much of this new pandemic business was for one-time COVID-related uses.

59. Customers told the Company that they would stop using its eSignature product once they returned to their offices.

60. The internal metrics available to Defendants confirmed this.

61. The Class Complaint contains allegations from fourteen confidential witnesses who worked for DocuSign. The plaintiffs to the Class Action have repeatedly represented to the Court that the documents and information obtained from DocuSign in discovery corroborates these confidential witness allegations and statements. *See, e.g.*, Updated Joint Case Management Statement dated January 10, 2025, at 12 ("Class Representatives believe that discovery to date generally supports the 14 CWs' allegations in the [Amended Complaint], including statements that CW 4 now recants in his declaration and CW 1's clarified statements."); *id.* at 17 ("[D]iscovery to date supports CW 4's allegations in the [Amended Complaint], as well as the 13 other CWs' allegations."). The Court relied on these CW allegations in denying Defendants' motion to dismiss the Class Action.

62. Between March and June 2020, customers told DocuSign that they did not intend to renew their eSignature contracts once the pandemic was over and they could return to their offices. These were one-time use cases or one-off users.

63. For example, according to the Class Complaint, CW 7 – an Account Executive who worked at DocuSign between September 2018 and June 2020 – stated that many customers told her they would not renew their contracts after they returned to the office.

64. CW 9 – an Enterprise Account Executive who worked at DocuSign between August

2020 and March 2022 – and CW 11 – an Account Executive who worked DocuSign from October 2020 through July 2021 – received similar feedback from their customers.

65. CW 8 – a Regional Vice President at DocuSign from the beginning of the pandemic through the Spring of 2021 who managed salespeople – stated, according to the Class Complaint, that some of her customers had one-off use cases that would not exist after the pandemic subsided.

66. According to the Class Complaint, there was a prevalence of one-time use cases by customers for DocuSign's eSignature product that would not extend beyond the pandemic, such as for PPP loans and the other types of loans being extended at the beginning of the pandemic. Although CW4 – a leader within DocuSign's Customer Success group between the summer of 2020 and spring 2022 – apparently has submitted a declaration in the Class Action recanting this statement, the plaintiffs to the Class Action have represented to the Court that CW 4's own emails produced in discovery support the statement, citing a May 4, 2021 email in which CW 4 noted that DocuSign was "reviewing the risk/exposure associated ***with the one-time/limited use cases that have been so prevalent during the pandemic***." Updated Joint Case Management Statement dated January 10, 2025, at 17. CW 4 also testified in deposition that he was actively seeking employment from DocuSign when he retained attorneys paid for by DocuSign to help draft his declaration recanting his statements.

67. CW 5 – a Regional Vice President ("RVP") of Sales Enterprise at DocuSign from April 2020 through December 2021 – told the plaintiffs to the Class Action that in the summer of 2020, DocuSign had some large public sector and government deals that were known to be one-off deals, since they were related to extending unemployment benefits.

68. Many customers who signed up for DocuSign eSignature during the pandemic declined to sign long-term contracts so they could opt out of DocuSign once the pandemic subsided.

69. CW 1 in the Class Action was employed by DocuSign as a Principal Analyst from November 2020 through November 2021, and was a member of the Sales and Business Intelligence groups. As part of his role, he was involved in analysis concerning Professional Services attached to licenses. Specifically, as a Principal Analyst, CW 1 evaluated which professional or educational services first-time or renewing DocuSign customers might require.

70. CW1 testified in deposition that it was his understanding that the standard eSignature subscription for DocuSign's enterprise customers and commercial customers was for a three-year term because the implementation of new software for these large customers could be time-consuming, and therefore a one-year subscription would often not be worth the time, energy, or money. However, during the pandemic, many new enterprise customers and commercial customers would only enter into one-year contracts.

71. Toward the end of 2020, as COVID-19 vaccines began to roll out, internal metrics proved out thee warning signs.

72. DocuSign tracked customer and sales data through a database called "Salesforce," to which, according to CW 8, the company's executives had access.

73. Another repository, "Snowflake," stored some of the company's data, including that within Salesforce.

74. In those databases, DocuSign actively tracked pre-COVID-19 customers separately from customers who signed up for DocuSign during the COVID-19 pandemic, and tracked key metrics such as product usage and retention rates separately for the latter.

75. This data began to show that pandemic customers used and retained DocuSign at lower rates than customers who purchased DocuSign before the pandemic began.

76. CW 1 testified in deposition that it was his recollection that customers who signed up during the pandemic had a higher churn rate and a steeper drop off in usage.

77. CW 1 also testified in deposition that he received information and reports that showed that, by December 2020, usage levels had dropped by about 30% from their peak in 2020 for customers who signed up for DocuSign's eSignature product after the pandemic began.

78. CW 1 further testified that he discussed these findings on a weekly basis with his supervisor, and that based on general practice within DocuSign, it was his expectation that these findings were being reported to DocuSign leadership.

79. Similarly, CW 3 – a finance analyst and manager in DocuSign's finance department who worked on DocuSign's revenue and bookings forecasts – testified in deposition that the forecasts and booking numbers prepared internally at DocuSign were shared with senior leaders,

including Defendant Gaynor and Defendant Alhadeff. CW 3 further testified that it was typical at DocuSign for Gaynor to regularly update Defendant Springer on relevant bookings forecasts.

## VI. The Truth Gradually Emerges

80. Starting at the end of 2021, statements made in DocuSign's quarterly earnings releases and on the accompanying earnings calls revealed that the Company was experiencing dramatically slowed billings growth as a result of waning demand for its products as customers began returning to their offices and resumed in-person signature processes.

81. After the market closed on December 2, 2021, DocuSign released its financial results for the third quarter of fiscal year 2022, revealing that its year-over-year billings growth had decreased to 28% for the quarter.

82. This was the second lowest billings growth that DocuSign had ever reported as a public company and represented a 35% decrease from the same quarter a year earlier, along with an 8% decrease from the same quarter immediately preceding the pandemic.

83. Thus, not only was DocuSign not sustaining the growth that it had experienced during the pandemic, but it was actually performing even lower than it had before the pandemic.

84. DocuSign also announced Defendant Sheridan's departure from the Company in its December 2, 2021 Form 8-K.

85. DocuSign held an earnings call on December 2, 2021, to discuss the company's financial results.

86. During that call, Defendant Springer stated that the company saw demand slow and the urgency of customers' buying patterns temper, describing those as "primary contributors" to the billings miss.

87. He also stated that DocuSign had "always" expected that demand would decrease after the pandemic subsided:

> [W]e always expected there to be a reduction of that really heightened COVID buying, which drove our growth rates dramatically higher than they had ever been even as we got bigger. So we expected that. I think the piece that we didn't expect are really the other two factors. So the one is while we would expect people to sort of return to sort of normalcy in purchasing, we didn't

> realize that they had been sort of well stocked with DocuSign, if you will. And we saw some of that purchasing behavior where people were, as you said, in that heightened demand model, probably purchasing more aggressively than we would have seen in the past.

88. However, Springer insisted that even as the pandemic receded and people began to return to their offices, "they are not returning to paper" and "eSignature and the broader Agreement Cloud are clearly here to stay."

89. In response to these disclosures, DocuSign's stock price dropped precipitously on December 3, 2021, falling $98.73 per share (more than 42%) to close at $135.09.

90. After the market closed on March 10, 2022, DocuSign released its financial results for the fourth quarter of fiscal year 2022, showing that the Company's year-over-year billings growth had again dropped, this time to 25% for the quarter.

91. This was the lowest billings growth DocuSign had ever experienced as a public company, and was far short of the 59% growth it reported at the beginning of the pandemic and the 40% growth reported a year prior.

92. DocuSign also said that its billings guidance for the fiscal year ending on January 31, 2023, would be between $2.71 and $2.73 billion, representing a substantial slowdown in billings growth."

93. In addition, DocuSign announced Defendant Alhadeff's resignation in its Form 8-K filed on March 10, 2022.

94. During the accompanying earnings call, Defendant Springer attributed the fourth quarter results and lower billings guidance to waning demand for the Company's product as people returned to in-person. Springer said:

> We saw a diminished level of urgency in [customers'] buying patterns. . . . As we saw urgent demand wane, we have just begun to shift our sales motion back to a demand generation mode of cross-sell, upsell and departmental expansion.

95. Still, Springer reiterated that as people began to return to their offices, "they are not returning to paper" and "eSignature is clearly here to stay."

96. The next day, DocuSign's stock price fell $18.87 per share, or more than 20%, closing at $75.01.

97. On June 9, 2022, after the market closed, DocuSign released its financial results for the first quarter of fiscal year 2023, showing that its year-over-year billings growth was at 16% for the quarter—the lowest billings growth DocuSign had ever experienced as a public company.

98. DocuSign also lowered its billings guidance for the second quarter of fiscal year 2023, representing even lower growth moving forward.

99. During the accompanying earnings call, Defendant Springer attributed the lower billings growth and guidance to waning customer demand.

100. At one point, he stated that much of the demand that DocuSign experienced during the pandemic was the result of single use cases that no longer existed. Specifically, he said:

> I would agree with the assessment that initially, probably underestimated, I underestimated sort of the impact in the post-COVID sort of demand acceleration and maybe how dramatic that was. Clearly, we saw that the business growth rate practically doubled, and we doubled the size of the company in sort of like, 6, 7 quarters. So it wasn't that we were not aware of the dramatic economics of it. I think we just didn't understand what portion of that would be things like onetime use cases or an acceleration where people bought in a more fulsome way.

101. On June 10, 2022, the price of DocuSign stock fell again, this time by $21.43 (or more than 24%) per share, closing at $65.93.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### I. Defendants' False and/or Misleading Statements about the Sustainability of DocuSign's COVID-19 Pandemic-Driven Growth

102. On June 4, 2020, DocuSign held an earnings call to discuss the Company's financial results for the first quarter of fiscal year 2021. During that call, Defendant Springer attributed the company's 59% year-over-year billings growth to pandemic-driven demand. "That said," he continued, "***even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes. Once they take their first digital transformation steps with us and they realize the time, cost, and customer experience benefits, they rarely go***

***back***."[1] In response to a question about one-time COVID use cases on DocuSign's billings growth, Springer said: "***We see that as the extreme minority***."

103. During the same call, Defendant Sheridan discussed the durability of the Company's billings growth, stating that "***we also believe that these customers will remain with us***" and that DocuSign's "situation is [not] analogous to Zoom" because "***we think [the 'churn' of customers is] going to remain pretty stable because we think that the value propositions, again, we're delivering are sustainable, whether it's a work-from-home environment or not***."

104. On June 10, 2020, Defendant Springer discussed the pandemic's impact on DocuSign's billings growth at the William Blair Growth Stock Conference. When asked about the sustainability of that growth, he said: "While there are some COVID-19 very specific use cases that we could imagine . . . ***the majority of the things that we've seen has just been an acceleration***."

105. On September 3, 2020, DocuSign held an earnings call to discuss the Company's financial results from the second quarter of fiscal year 2021. During that call, Defendant Springer stated that the "greater adoption" of DocuSign's offerings was "something we believe ***will persist beyond the crisis. Because in our experience, it's very rare to see anyone go back to paper once they've gone digital***." Springer also stated that "the trends that emerged in the latter half of [the first quarter] have continued throughout [the second quarter]" and "[w]e've seen a sustained rise in demand for our core eSignature offering." He later discussed the "need to digitize the business," saying that "we believe that, that's going to be sustained even after things return to whatever normal looks like in the future . . . ***we don't see trends that things are going to return to the way they looked and trended pre-COVID***."

106. On September 14, 2020, Defendant Springer participated in the Deutsche Bank Virtual Technology Conference, where he again discussed the sustainability of DocuSign's billings growth. When asked whether DocuSign's demand was beginning to "normalize" to pre-pandemic levels, Springer stressed that after people switch from paper to digital processes, "***they don't go***

---

[1] Unless otherwise noted, bold italic emphasis throughout this Complaint has been added to highlight the portions of the statements that were materially false and/or misleading.

***back. No one's going to***." "***It just doesn't happen***," he added. "[***T]hey're here for the long term***."

107. On September 15, 2020, Defendant Springer attended the Jefferies Software Virtual Conference and was asked about the "durability of the digital transformation many businesses had experienced because of COVID-19." "I feel very strongly ***the answer is people don't go back***," he said, adding: "***[W]e don't feel there's a sense of stuff that's accelerated this year would disappear***."

108. On December 3, 2020, DocuSign held an earnings call to discuss the Company's financial results from the third quarter of fiscal year 2021. On that call, Defendant Springer again expressed confidence about the sustainability of the Company's billings growth, saying that DocuSign's value remained strong "***whether customers began using our product before or after the pandemic began***," adding: "***We don't see customers going back to pen and paper***." Later, he reiterated this sentiment, saying that customers "***do not go back***" and that "[w]e believe that trend"—the move by customers from paper to digital processes—"***will hold when the pandemic subsides***."

109. Defendant Springer was also asked whether the demand for DocuSign's eSignature product was "'pulled forward' by the pandemic, such that demand in later quarters would decrease." He denied the proposition, saying that "***we've accelerated that growth not because we're sort of robbing from the future, but we're just getting closer towards that $25 billion [total addressable market] opportunity***."

110. On January 11, 2021, Defendant Gaylor participated in the Needham Virtual Growth Conference, where she discussed the increased demand for DocuSign's eSignature product. Gaylor said that "the ***pandemic really accelerated what people were otherwise going to do. And so it's not kind of a one and done sort of mentality***. It's really a kind of progression of things that were going to happen over a period of time." She further stated that the Company "continue[s] to see that accelerated demand. But we believe it's kind of ***once people move from manual processes, pen and paper, they're not going to go back once they kind of have the DocuSign experience and are in the kind of more digitized experience***."

111. On March 1, 2021, Defendant Springer attended the Morgan Stanley Technology, Media and Telecom Conference where he again discussed the sustainability of DocuSign's demand.

"***[N]o one's going back to paper and manual process***," he said. "***Going back to paper, going back to the manual processes and the time lags and the cost increases, we just don't see people going back in use cases***."

112. On March 11, 2021, DocuSign released its financial results for the fourth quarter of fiscal year 2021. During the earnings call, Defendant Springer again reiterated that "***we don't believe our new or expanded customers will be going back to paper even after the pandemic recedes***."

113. In response to a question about whether DocuSign was seeing any change in demand given the rollout of the COVID-19 vaccine, Springer stated: "We haven't seen anything" and "***we haven't seen anything in our business that suggests that, that will change***." Regarding customers, he said: "***[T]hey're not going back. People aren't going back to paper. They're not going back to manual processing***." He then reiterated that, "***[w]e haven't seen any change yet***" and "***at this point, yes, we haven't seen a change yet***."

114. On March 24, 2021, DocuSign hosted an Analyst Day, where Defendant Gaylor interviewed Defendant Springer about several topics. When asking her first question to Springer, Gaylor stated that "***the permanence of these trends we've been seeing across the business look like they're really here to stay***."

115. During another portion of the interview, Springer was asked "how investors should think about DocuSign post-pandemic" and about the sustainability of the company's growth. In response, Springer stated: "***[T]his is not a short-term thing. This is not something that just sort of happened because of the pandemic***." "[W]e believe ***it's going to continue to happen for years***," and added "we've seen sort of a one-time step-up where people actually accelerated their transformation at a faster rate."

116. On March 31, 2021, Defendant Alhadeff sent a tweet with a link to a news article discussing the increased demand for DocuSign's eSignature product and wrote: "***I don't see levels of adoption @DocuSign changing significantly post-pandemi***c."


Loren Alhadeff
@LorenAlhadeff

I don't see levels of adoption @DocuSign changing significantly post-pandemic. Once a company sees the benefits of a digital process, there's multiple reasons to stay with it. protocol.com/enterprise/doc...

2:13 PM · Mar 31, 2021

117. During DocuSign's June 3, 2021 earnings call discussing the Company's financial results for the first quarter of fiscal year 2022, Defendant Springer reiterated his statements about the Company's growth. Specifically, he said that "***once businesses usually transform their agreement processes, they simply don't go back***. We believe this trend will only accelerate as the anywhere-economy continues to emerge." Later, he added that "once [customers] see the benefits of the digital transformation, particularly around the Agreement Cloud from having opportunity to grow their business with us, ***they don't go back***. In fact, they look for additional opportunities to expand."

118. On June 10, 2021, Defendant Gaylor participated in the Robert W. Baird Global Consumer, Technology & Services Conference. Gaylor was asked whether DocuSign was experiencing any "moderation" in usage as the COVID-19 pandemic waned. In response, Gaylor stated that once people moved to a digital platform "***they're not going to go back and move to pen and paper***[.]"

119. DocuSign held second quarter 2022 earnings call on September 2, 2021. During that call, Defendant Gaylor stated: "***Regardless of whether people go back to the office, we don't see them going back to pen and paper***." Later in the call, Defendant Springer denied seeing any slowdown in demand: "I don't think there's a perspective we have that the business has some significant slowdown . . . ***we're not seeing any differences in churn rates in any meaningful way . . . customers very rarely leave us***."

120. On September 8, 2021, Defendant Gaylor attended the Wolfe Research Inaugural TMT Conference, where she was asked about the durability of DocuSign's growth and reiterated: ***"[P]eople are not going to go back to pen and paper*** once they've signed digitally or once they've been able to do agreements and the different components of agreements, digitally." Later, when

asked about the impact of COVID-related one-time use cases, Gaylor responded: "I would say that's ***the vast minority*** . . . ."

121. On December 2, 2021, Defendant Springer told investors on DocuSign's earnings call: "***Even as the pandemic subsides and people begin to return to the office, they are not returning to paper***. ***eSignature and the broader Agreement Cloud are clearly here to stay***, and DocuSign's value will persist no matter how the future of work unfolds."

122. On March 10, 2022, Defendant Springer stated on DocuSign's fourth quarter 2022 fiscal year earnings call: "***As the pandemic subside[s] and people begin to return to the office, they are not returning to paper***. ***eSignature is clearly here to stay***, and the movement toward the broader Agreement Cloud will only continue to gain prominence."

123. As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements above in paragraphs 102 through 122 were materially false and/or misleading and omitted to state material facts. Defendants knew and concealed from investors numerous adverse material facts indicating that the COVID-19-fueled demand it was experiencing was unsustainable. Defendants knew that much of the new business influx at the beginning of the pandemic was for one-time COVID-related uses and that customers had told the Company that they would stop using its eSignature product once they returned to their offices. Internal metrics and data available to Defendants undermined their public statements about the sustainability of DocuSign's COVID-19 pandemic-driven growth, rendering them materially false and/or misleading.

## II. Defendants' False and Misleading Statements About the Effectiveness of DocuSign's Internal Disclosure Controls and Procedures

124. Throughout the relevant time period, Defendants repeatedly and falsely certified to investors that they had established effective internal disclosure controls and procedures for the Company to ensure that and material information relating to DocuSign had been made known to its CEO and CFO.

125. For each fiscal quarter between the first quarter of fiscal year 2021 and second quarter of fiscal year 2022, DocuSign's CEO (Defendant Springer) and CFO (Defendant Sheridan

and then Defendant Gaylor) each provided certifications with DocuSign's quarterly reports on Form 10-Q and its annual reports on Form 10-K filed with the SEC pursuant to Section 302 of SOX. In those certifications, Defendant Springer. Sheridan, and Gaylor stated:

> 4. [DocuSign's] other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) . . . for [DocuSign] and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to [DocuSign]***, including its consolidated subsidiaries, ***is made known to us*** by others within those entities, particularly during the period in which this report is being prepared;
>
> . . .
>
> (c) Evaluated the effectiveness of [DocuSign's] disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation . . . .

126. In each of the periodic reports accompanying these certifications, DocuSign represented that DocuSign's "disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by" DocuSign was "accumulated and communicated to [DocuSign's] management, including [DocuSign's] Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding any required disclosure." That is to say, Defendants Springer, Sheridan, and Gaylor certified pursuant to federal law that they had put in place effective internal controls to make sure that all material information was being disclosed to the investing public.

127. These certifications were materially false and misleading and omitted to state material facts. It was materially misleading for Defendants to represent that DocuSign's internal disclosure controls and procedures were effective during the relevant period when that was not the case. Among other things, Defendants knew but failed to inform investors that the COVID-19-fueled demand it was experiencing was unsustainable because much of the new business influx at

the beginning of the pandemic was for one-time COVID-related uses and customers had told the Company that they would stop using its eSignature product once they returned to their offices. Defendants knew but failed to inform investors that internal metrics and data available to Defendants undermined their public statements about the sustainability of DocuSign's COVID-19 pandemic-driven growth.

## ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

128. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

129. Defendants Springer, Sheridan, Gaylor, and Alhadeff acted with scienter with respect to the materially false and misleading statements of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made. As the most senior executives of DocuSign during the relevant time period, their scienter is imputable to DocuSign.

130. The eSignature issues were reported to the individual defendants and other senior executives along with other analyses showing that DocuSign's internal financial forecasts were in decline compared to historical data.

131. Defendants likely received internal reports reflecting alarming key performance metrics by no later than early 2021, and contrary to their repeated public assurances, they knew that the Company's pandemic-fueled demand was unsustainable.

132. DocuSign customers had one-off use cases, said they did not intend to use the company's eSignature product after the pandemic subsided, and would only sign one-year contracts.

133. DocuSign's lagging internal metrics, including declining usage and retention rates among customers who signed up during the pandemic, contradict Defendants' public statements.

134. DocuSign's executives had the ability to access Salesforce, which contained customer data.

135. Internally, DocuSign identified customers as pre- and post-COVID-19 customers in the Salesforce and Snowflake databases, and tracked metrics, including product usage and retention separately for customers who purchased DocuSign products after the pandemic began.

136. Defendants Sheridan and Gaylor also made statements on different earnings calls that indicate that they closely tracked customer demand data.

137. For example, Defendant Sheridan stated during the September 3, 2020 earnings call that, "[w]e're looking at the demand data very carefully to try to forecast the trends."

138. During the March 11, 2021 call, Defendant Gaylor said that DocuSign's guidance was "largely data-driven" and used "everything from pipeline and demand trends to close rates."

139. During the September 2, 2021 earnings call, Defendant Gaylor stated that consumer consumption was "something that we track" and "watch very closely."

140. These statements demonstrate that the individual defendants had access to and monitored data indicating DocuSign's decline in customer demand.

141. Defendants Springer's and Gaylor's stock sales are also indicative of scienter.

142. On February 1, 2021, when DocuSign stock was trading at approximately $230 per share, Defendant Springer sold more than 19% of his stock in the company, or 356,479 shares, earning more than $81.85 million.

143. This was the first time that Springer had sold any DocuSign shares in the open market since the company went public in April 2018.

144. Defendant Springer also disposed of almost 12% of his DocuSign stock, or 354,598 shares, through Code F transactions worth over $71.5 million. In all, Springer sold 711,077 shares—almost 24% of his DocuSign stock—earning over $153 million.

145. On November 8, 2021, less than one month before Defendants' first corrective event and when DocuSign stock was still trading at artificially inflated prices, Defendant Gaylor sold nearly 36% of her DocuSign stock, or 5,983 shares, earning more than $3.31 million. Like Springer, this was the first time Gaylor had sold any DocuSign shares in the open market. She also disposed of 9,070 shares (or almost 42%) of DocuSign stock through Code F transactions worth more than $2.13 million. In all, Gaylor sold 15,053 shares (more than 69%) of her DocuSign stock, earning more than $5.45 million.

146. Although Springer and Gaylor sold their stock pursuant to 10b5-1 trading plans, Defendants concealed negative information before the sales and set the sales for certain dates.

**PLAINTIFFS' ACTUAL RELIANCE**

147. With respect to their investments in DocuSign common stock that are the subject of this Complaint, Plaintiffs were subadvised by Jennison, a New York-based investment adviser.

148. Plaintiffs, through Jennison, actually read or heard, reviewed, and justifiably relied on the representations set forth above prior to purchasing DocuSign common stock on the dates set forth in Exhibits A-B to the extent each such statement had been made at the time of purchase.

149. Prior to purchasing DocuSign common stock on behalf of Plaintiffs, an investment professional at Jennison actually read or heard, reviewed, and justifiably relied on DocuSign's SEC filings as well as Defendants' other public disclosures, press releases, and presentations including, as applicable, Defendants' statements regarding the sustainability of DocuSign's COVID-19 pandemic-driven growth and the effectiveness of DocuSign's internal disclosure controls and procedures.

150. As Jennison continued to purchase DocuSign common stock on behalf of Plaintiffs, an investment professional at Jennison kept abreast of publicly disclosed developments concerning DocuSign and, prior to purchasing DocuSign stock, actually read or heard, reviewed, and justifiably relied on DocuSign's SEC filings as well as Defendants' other public disclosures, press releases, and presentations including, as appliable, Defendants' statements regarding the sustainability of DocuSign's COVID-19 pandemic-driven growth and the effectiveness of DocuSign's internal disclosure controls and procedures.

151. Each of Defendants' statements was material to Jennison's decision to purchase DocuSign common stock on behalf of Plaintiffs.

152. Defendants' statements regarding the sustainability of DocuSign's COVID-19 pandemic-driven growth were material to Plaintiffs. Whether the increased demand that DocuSign experienced at the onset of the global pandemic was sustainable or merely transitory was a key factor in deciding whether to invest in DocuSign.

153. Defendants' statements regarding the effectiveness of DocuSign's internal disclosure controls and procedures were also material because they assured investors that material information about DocuSign would be disclosed to investors, and that DocuSign was complying with disclosure

laws.

154. To the extent that each such statement had been made at the time of purchase, Jennison actually and justifiably relied on Defendants' statements regarding the sustainability of DocuSign's COVID-19 pandemic-driven growth and the effectiveness of DocuSign's internal disclosure controls and procedures in making each purchase of DocuSign common stock on behalf of Plaintiffs, as set forth in Exhibits A-B.

155. Plaintiffs' reliance on these statements of material fact was reasonable and justifiable. Plaintiffs were open-market purchasers of DocuSign common stock that did so based on Defendants' representations.

**PRESUMPTION OF RELIANCE**

156. Plaintiffs also intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (1) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (2) the omissions and misrepresentations were material; (3) DocuSign common stock traded in an open and efficient market; (4) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of DocuSign common stock; and (5) Plaintiffs purchased or acquired DocuSign common stock between the time when Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

157. The market for DocuSign common stock was open, well-developed and efficient at all relevant times. As a result of the aforementioned materially false and misleading statements, DocuSign common stock traded at artificially inflated prices during the relevant period. The artificial inflation dissipated as the market learned of the nature and extent of Defendants' misrepresentations regarding the sustainability of DocuSign's COVID-19 pandemic-driven growth and the ineffectiveness of DocuSign's internal disclosure controls and procedures.

158. At all relevant times, the market DocuSign common stock was efficient for the following reasons, among others: (1) DocuSign filed periodic reports with the SEC; (2) DocuSign common stock met the requirements for listing, was listed and actively and highly traded on the

NASDAQ, a highly efficient market, during the time that Plaintiffs purchased or acquired DocuSign common stock; (3) numerous analysts followed DocuSign, each of which wrote reports that were publicly available and entered the public marketplace; and (4) DocuSign regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services. As a result, the market for DocuSign common stock promptly digested current information regarding DocuSign from all publicly available sources and such information was reflected in DocuSign's stock price.

159. Plaintiffs relied on the market price of DocuSign's common stock, which reflected all the information in the market, including the misstatements by Defendants.

160. In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

## LOSS CAUSATION

161. As the truth about Defendants' fraud was gradually but only partially revealed to the market, the price of DocuSign's common stock plummeted and Plaintiffs suffered significant investment losses.

162. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs. During the time that Plaintiffs purchased DocuSign common stock, as set forth in Exhibits A-B, the market price of that common stock was artificially inflated as a direct result of Defendants' materially false and misleading statements. Specifically, Defendants' statements regarding the sustainability of DocuSign's COVID-19 pandemic-driven growth and the effectiveness of DocuSign's internal disclosure controls and procedures caused the price of DocuSign common stock to be artificially inflated.

163. As described above in paragraphs 80 through 101, as a series of partial but inadequate disclosures were issued partially revealing the false and misleading nature of

Defendants' statements regarding the sustainability of DocuSign's COVID-19 pandemic-driven growth and the effectiveness of DocuSign's internal disclosure controls and procedures, and as the foreseeable risks previously concealed by Defendants' material misrepresentations and omissions partially materialized, the price of DocuSign common stock plummeted and Plaintiffs were damaged.

## NO SAFE HARBOR

164. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the statements pleaded herein were not forward-looking statements. To the extent there were forward-looking statements, some were not identified as forward-looking and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For the remaining forward-looking statements, they failed to alert investors that some of the risks may have already come to fruition. Moreover, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of DocuSign who knew that those statements were false when made.

## FIRST CAUSE OF ACTION
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

165. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

166. This cause of action is brought against Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

167. Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements alleged herein to: (1) deceive the investing public,

including Plaintiffs, as alleged herein; (2) artificially inflate and maintain the market price of DocuSign common stock; and (3) cause Plaintiffs to purchase DocuSign common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff took the actions set forth above.

168. Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff both directly and indirectly: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of DocuSign common stock in an effort to artificially inflate and maintain the market prices for DocuSign common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

169. By virtue of their high-level positions at DocuSign, Defendants Springer, Sheridan, Gaylor, and Alhadeff were authorized to make public statements, and made public statements, on DocuSign's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of DocuSign's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

170. In addition, Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of DocuSign common stock would be based on truthful, complete, and accurate information.

171. Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants DocuSign's, Springer's, Sheridan's, Gaylor's, and Alhadeff's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to the sustainability of DocuSign's COVID-19 pandemic-driven growth and the ineffectiveness of DocuSign's internal disclosure controls and procedures.

By concealing these material facts from investors, Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff supported the artificially inflated price of DocuSign common stock.

172. The dissemination of the materially false and misleading information, as set forth above, artificially inflated the market price of DocuSign common stock. In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which DocuSign's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiffs purchased DocuSign common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued and the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized, the price of DocuSign common stock substantially declined.

173. At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the sustainability of DocuSign's COVID-19 pandemic-driven growth and the ineffectiveness of DocuSign's internal disclosure controls and procedures, which were concealed by Defendants, Plaintiffs would not have purchased DocuSign common stock.

174. By virtue of the foregoing, Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

175. As a direct and proximate result of Defendants DocuSign's, Springer's, Sheridan's, Gaylor's, and Alhadeff's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in DocuSign common stock.

176. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## SECOND CAUSE OF ACTION

**Violations of Section 20(a) of the Exchange Act**
**Against Defendants Springer, Sheridan, Gaylor, and Alhadeff**

177. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

178. This cause of action is brought against Defendants Springer, Sheridan, Gaylor, and Alhadeff for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

179. Each of Defendants Springer, Sheridan, Gaylor, and Alhadeff was a controlling person of DocuSign within the meaning of Section 20(a) of the Exchange Act.

180. By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, DocuSign's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC or disseminated to the investing public, Defendants Springer, Sheridan, Gaylor, and Alhadeff had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

181. Defendants Springer, Sheridan, Gaylor, and Alhadeff were provided with or had unlimited access to copies of DocuSign's press releases, scripts, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, Defendants Springer, Sheridan, Gaylor, and Alhadeff each had direct and supervisory involvement in the day-to-day operations of DocuSign and therefore are presumed to have had the power to control or influence the particular false and misleading statements giving rise to the securities violations alleged herein.

182. Defendants Springer, Sheridan, Gaylor, and Alhadeff culpably participated in DocuSign's violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

183. By reason of the conduct alleged in the First Cause of Action, DocuSign is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Springer, Sheridan, Gaylor, and Alhadeff are liable pursuant to Section 20(a) based on their control of DocuSign.

184. Defendants Springer, Sheridan, Gaylor, and Alhadeff are liable for the aforesaid wrongful conduct and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of DocuSign common stock.

185. Taking into account, *inter alia*, tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

**THIRD CAUSE OF ACTION**
**Common Law Fraud**
**Against All Defendants**

186. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

187. This cause of action is brought against Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff for violations of the common law.

188. Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading to induce Plaintiffs to purchase DocuSign common stock. Specifically, Defendants made numerous material misrepresentations or omitted material facts about the sustainability of DocuSign's COVID-19 pandemic-driven growth and the ineffectiveness of DocuSign's internal disclosure controls and procedures.

189. Defendants DocuSign, Springer, Sheridan, Gaylor, and Alhadeff knew that their statements were false when made or omitted material facts or, at the very least, made the statements with reckless disregard for their truth. As high-level executives at DocuSign, Defendant Springer's, Sheridan's, Gaylor's, and Alhadeff's scienter is imputable to DocuSign.

190. Defendants knew that investors like Plaintiffs would review and rely on such misrepresentations and intended that their false and/or misleading statements and omissions would induce Plaintiffs to purchase DocuSign common stock at inflated prices.

191. These statements were material to Plaintiffs and Plaintiffs actually, reasonably, and

justifiably relied on them when purchasing DocuSign common stock. At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the sustainability of DocuSign's COVID-19 pandemic-driven growth and the ineffectiveness of DocuSign's internal disclosure controls and procedures, which were concealed by Defendants, Plaintiffs would not have purchased DocuSign common stock.

192. As a direct and proximate result of Defendants DocuSign's, Springer's, Sheridan's, Gaylor's, and Alhadeff's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in DocuSign common stock.

193. Defendant DocuSign's, Springer's, Sheridan's, Gaylor's, and Alhadeff's wrongful conduct, as described above, was malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

a. Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

b. Awarding Plaintiffs punitive damages for Defendants' intentional, malicious, willful, and wanton conduct as detailed above;

c. Awarding Plaintiffs their expenses, attorneys' fees, and costs; and

d. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: June 3, 2025

Respectfully submitted,

Harbor Capital Appreciation Fund and Harbor Capital Appreciation CIT

By: */s/ Adrian Sawyer*
Adrian Sawyer (Bar # 203712)

Lawrence M. Rolnick (*pro hac vice* forthcoming)
Michael J. Hampson (*pro hac vice* forthcoming)
Richard A. Bodnar (*pro hac vice* forthcoming)
ROLNICK KRAMER SADIGHI LLP
PENN 1, Suite 3401
One Pennsylvania Plaza
New York, New York 10119
(212) 597-2800
lrolnick@rksllp.com
mhampson@rksllp.com
rbodnar@rksllp.com